Rulon T. JEFFS, Kenneth Steed, James K. Zitting, Fred M. Jessop, Winston K. Blackmore, LeRoy S. Jeffs, Truman I. Barlow, and Parley J. Harker, trustees for the United Effort Plan, a Utah Trust, Plaintiffs, Appellants, and Cross–Appellees,

v.

Cora Fischer STUBBS, David L. Stubbs, John M. Williams, Merrill Harker, Harvey J. Dockstader, T. David Dockstader, Fayila M. Williams, Marko J. Dutson, Ray D. Timpson, George R. Hammon, Don D. Timpson, J. Legrand Hammon, John W. Timpson, Claude Cooke, Cyril Bradshaw, J. Michael Pipkin, Connell Bateman, Thomas J. Williams, Benjamin Bistline, Donald B. Cox, Defendants, Appellees, and Cross–Appellants.

No. 960454.

Supreme Court of Utah.

Sept. 1, 1998.

Rehearing Denied Nov. 18, 1998.

Reed L. Martineau, Rodney R. Parker, Salt Lake City, for plaintiffs, appellants and cross-appellees.

Raymond S. Berry, Salt Lake City, for the United Effort Plan Trust.

Nicholas E. Hales, Reid W. Lambert, Salt Lake City, for defendants, appellees, and cross-appellants.

ZIMMERMAN, Justice:

This case involves a dispute over the occupancy of land between twenty-one individuals ("the claimants") and the United Effort Plan Trust ("the UEP"). The claimants built improvements on land located in Hildale, Utah, and Colorado City, Arizona, which they occupy but which is owned by the UEP. Claimants filed an action in Washington County, Utah, to determine their rights in the UEP land they occupy.

Claimants asserted ten causes of action: for relief under the Utah Occupying Claimants Act, and for breach of express contract, breach of implied contract, negligent misrepresentation, constructive fraud, estoppel, unjust enrichment, breach of fiduciary duty, accounting, and distribution of trust. The trial court separated the first seven claims relating to the claimants' property rights for trial, holding in abeyance the three trust-based issues. After trial, the court relied on an unjust enrichment theory to hold that the claimants were entitled to occupy the UEP land during their lifetimes or to receive compensation for the improvements they made. The court imposed a constructive trust in favor of the claimants. The trial court denied relief on the three trust-based claims because it concluded that the UEP was a charitable, not a private, trust.

Each party appealed. The UEP argues that (i) the trial court erred in awarding claimants a continuing interest in the land on an unjust enrichment theory and (ii) giving the claimants a continuing interest in the land infringes on the remaining UEP members' free exercise of religion and therefore violates the Utah and United States Constitutions. On their cross appeal, the claimants argue that the trial court erred (i) by applying the wrong legal standard to their claim under Utah's Occupying Claimants Act ("the Act") and (ii) in finding that the UEP is a charitable trust. We reject the UEP's arguments, affirm the trial court's unjust enrichment ruling, reverse its conclusion that the trust is charitable, reverse its interpretation of the Utah Occupying Claimants Act, and

remand for further proceedings. Before proceeding to our analysis, we set forth the facts taken from the trial court's extensive findings.

Sometime in the late nineteenth century, some members of the Church of Jesus Christ of Latter–Day Saints organized a movement called the Priesthood Work ("The Work") to continue the practice of plural marriage outside that church. In the early part of this century, The Work's leadership—the Priesthood Council—decided to settle its membership in an isolated area to avoid interference with their religious practices. In approximately the 1930s, The Work selected an area composed of Hildale, Utah, and Colorado City, Arizona—an area now known as Short Creek. The Priesthood Council secured a large tract of land in this area, and adherents of The Work began to settle there.

The Work continued to secure additional land in the area. Commonly, its adherents bought land and deeded it to The Work. Eventually, the leadership of The Work formed a trust to hold title to the land. This trust failed, and, for the most part, the land was deeded back to those who contributed it. In 1942, the Priesthood Council signed and recorded in Mohave County, Arizona, a Declaration of Trust for the United Effort Plan. After the Priesthood Council formed the UEP, adherents deeded most of the land that had been held by the first trust to the UEP. Over the years, the UEP acquired more land as adherents obtained and deeded it to the trust. The UEP currently owns all the land occupied by the claimants.

From its inception, the UEP invited members to build their homes on assigned lots on UEP land. Through this system, the UEP intended to localize control over all local real property and to have the religious leaders manage it. Members who built on the trust land were aware that they could not sell or mortgage the land and that they would forfeit their improvements if they left the land. However, the UEP did encourage its members to improve the lots assigned to them and represented to its members that they

could live on the land permanently, by using such phrases as "forever" or "as long as you wanted." The leaders also told members that having a home on UEP land was better than having a deed because creditors could not foreclose upon the land for members' debts.

Sometime during the late 1960s or early 1970s, dissension over a doctrinal issue arose among adherents of The Work, causing a split in the Priesthood Council. The dissension broke into the open in 1984 when adherents of The Work split into two groups: One group, led by Rulon T. Jeffs ("Jeffs"), acquired control of the UEP. A second group, led by J. Marion Hammon and Alma Timpson, includes most of the claimants in the present case.[1]

In 1986, Jeffs declared that all those living on UEP land were tenants at will. Before this declaration, neither the UEP nor any of its representatives had told the claimants that they were tenants at will. In 1987, the claimants filed an action in the Federal District Court for the District of Utah, asking the court to determine their rights in the property. The UEP, in turn, filed an unlawful detainer action and several quiet title actions against some of the claimants in state court in 1989 and 1993. The state court stayed these cases pending resolution of claimants' federal action. In 1993, the federal district court dismissed the federal claims for lack of subject matter jurisdiction and dismissed the pendent state law claims without prejudice. Shortly thereafter, the claimants filed an action in Utah's district court in Washington County. The state court consolidated their action with the UEP's previously filed unlawful detainer action and several quiet title actions.

In these consolidated actions, the claimants presented a number of claims, the most pertinent of which is that they are entitled to their lots under the Utah Occupying Claimants Act, see Utah Code Ann. §§ 57–6–1 to –

8, and, alternatively, that the UEP has been unjustly enriched by their improvements to the land. After a bench trial, the judge made findings of fact and granted claimants relief only on their unjust enrichment claim. It found as a matter of statutory interpretation that they were not covered by the Utah Occupying Claimants Act.

On appeal, the claimants argue that the trial court erred in applying the Act. They also argue that the trial court erred in finding that the UEP is a charitable, not a private, trust—a finding that precluded claimants from prevailing on their claims related to the conduct of the trustees. For its part, the UEP asserts that the trial court erred in granting claimants equitable relief, primarily because application of equitable principles to a religious organization violates the Utah and United States Constitutions. We address each issue in turn.

The standard of review for the trial court's interpretation of the Act is straightforward.[2] Because a district court's interpretation of a statute is a legal question, we review its ruling for correctness. See Mac-Kay v. Hardy, 896 P.2d 626, 630–31 (Utah 1995). On the other hand, we uphold a trial court's findings of fact unless they are "clearly erroneous." See Drake v. Industrial Comm'n of Utah, 939 P.2d 177, 181 (Utah 1997). Because appellant did not provide a trial transcript on appeal, we assume competent and substantial evidence supported the trial court's extensive factual findings. See Goodman v. Lee, 589 P.2d 759, 760 (Utah 1978) ("When no transcript is furnished on an appeal it is presumed that the evidence given was sufficient to sustain the judgement."); Walker Bank & Trust Co. v. Neilson, 26 Utah 2d 383, 490 P.2d 328, 329 (1971) ("The appellant elected not to bring before us any of the testimony presented to the trial court, and so we must presume such findings as were made to be based upon competent and substantial evidence."). Therefore, we

---

**1.** Some of the claimants now claim no affiliation with either group.

**2.** Only claimants occupying land situated in Utah have an action under Utah's Occupying Claimant Act. Arizona has no counterpart to this statute.

will not overturn the trial court's factual findings. The determinative issues are, then, issues of law.

The first question is whether the trial court correctly interpreted the Utah Occupying Claimants Act. Section 57–6–1 of the Act provided:

> Where an occupant of real estate has *color of title* thereto, and in *good faith* has made *valuable improvements* thereon, and is afterwards in proper action found not to be the owner, no execution shall issue to put the plaintiff in possession of the same after the filing of a complaint as hereinafter provided, until the provisions of this chapter have been complied with.

Utah Code Ann. § 57–6–1 (1994) (emphasis added).[3] This statute requires occupying claimants to show that they (i) have "color of title" and (ii) made valuable improvements (iii) in good faith. *See Hidden Meadows Dev. Co. v. Mills*, 590 P.2d 1244, 1249 (Utah 1979). The district court found that the claimants had made valuable improvements. However, it did *not* determine whether claimants had color of title because it had first concluded that the claimants did not make the improvements in "good faith" as required by the statute.

■ We address the preliminary question of whether the claimants had color of title before addressing the determination that they lacked good faith. Section 57–6–4 of the Code defines "color of title." It states:

> [A]ny person has color of title who has occupied a tract of real estate by himself, or by those under whom he claims, [i] *for the term of five years, or* [ii] who has thus occupied it for less time, if he, or those under whom he claims, *have at any time during such occupancy with the knowledge or consent, express or implied, of the real owner made any valuable improvements thereon,* or [iii] if he or those under whom he claims have at any time during such

occupancy paid the ordinary county taxes thereon for any one year, and two years have elapsed without a repayment of the same by the owner, and the occupancy is continued up to the time at which the action is brought by which the recovery of the real estate is obtained.

Utah Code Ann. § 57–6–4 (1994) (brackets and emphasis added).[4] Factually, categories (i) and (ii) cover all the claimants here. They either "occupied a tract of real estate ... for the term of five years," or they, or those under whom they claim, have made "valuable improvements" to real estate "with the owner's knowledge or consent." *See id.* The facts found by the district court show that the UEP knew that all the claimants were improving the land and encouraged them to do so. In many cases, claimants obtained consent from The Work's leadership to improve the land. The claimants, therefore, have color of title.

■ The next requirement under section 57–6–1 is that the claimants show that they made the improvements in "good faith." The trial court found that they did not. In defining the statutory term, "good faith," the trial court relied on case law stating that "[t]he good faith of an occupying claimant must be premised upon a reasonable and honest belief of ownership." *Ute–Cal Land Dev. Corp. v. Sather*, 645 P.2d 665, 667 (Utah 1982). The trial court concluded that the claimants did not make the improvements in good faith because they had "not even claimed that they actually own the land they occupy" and because "they were installed upon the property of the UEP, knowingly by those who were using the land by permission." We conclude that the trial court erred in its interpretation of "belief of ownership."

■ The trial court appears to have assumed that "ownership" means possession of a fee simple interest in land. But it is settled law that " '[o]wnership' is a collection of

---

**3.** Section 57–6–1 was amended in 1995, changing "plaintiff" to "owner" and making stylistic change. *See* Utah Code Ann. § 57–6–1 (Supp. 1997).

**4.** The quoted language is now found in section 57–6–4(2)(a) (Supp.1997).

rights to possess, to use and to enjoy property, including the right to sell and transmit it. . . . [T]he term owner is often used to characterize the possessor of an interest less than that of absolute ownership, such as . . . a tenant for life." 63C Am.Jur.2d *Property* § 26 (1997). We have no reason to think that when the Act was passed the legislature intended to restrict the meaning of the term "ownership" to a narrower class of interests in land than the general law would allow.[5] We therefore conclude that a good faith belief in a life interest in land satisfies the good faith requirement of the Utah Occupying Claimants Act.

In the present case, the claimants acknowledged that they do not hold fee simple title. But the evidence before the trial court is entirely consistent with the claimants' having a good faith belief that they were entitled to possess the property during their lives so long as they did not abandon the property. The law describes such an interest as a life estate, and a life estate is an "ownership" interest. *See id.*[6] On this point, however, we must remand the matter for additional specific findings as to claimants' beliefs of a life estate interest.

 The claimants presented evidence that the UEP represented to them that they could occupy the land for their lives or for as long as they lived on the land. And the trial court concluded that these representations "could reasonably have created in [claim-ants'] mind[s] an expectation that [they] would be able to live out [their] days on the [UEP] land so long as [they] did not sell the land, mortgage it or abandon its use." But because the trial court believed the Act required a good faith belief of a fee simple interest, it made no specific findings as to claimants' beliefs that they possessed a life estate interest. Absent such a belief, good faith would be lacking. If an appellate court determines that findings of fact are insufficient to support a necessary legal conclusion, the appellate court will normally remand the matter for further proceedings. *See Willey v. Willey*, 951 P.2d 226, 230 (Utah 1997). While we think the trial court would have made a finding of good faith belief in a life estate if it had been asked, we are not certain. Because it is not our place to find facts, *see id.* at 230–31 (citing *State v. Pena*, 869 P.2d 932, 936 (Utah 1994); *State v. Thurman*, 846 P.2d 1256, 1266 (Utah 1993)), we remand this issue to the trial court for additional findings and, if it deems appropriate, for additional evidence on the good faith issue.[7] If it concludes that some or all of the claimants have a life estate, then it should enter an order giving them a remedy under the Act.

This does not end this matter, however. Those claimants occupying land in Arizona have no remedy under the Utah Occupying Claimants Act. Therefore, we must still determine whether the trial court properly granted that group of claimants an equitable

---

5. The only restriction intended by the legislature is indicated by the express language of section 57–6–1, stating that the Act should not be construed to create any ownership interest in a tenant against a landlord.

6. Because the UEP represented to claimants that they could occupy the land for their lives, so long as they did not sell, mortgage, or abandon the property, the claimants' interest is actually a life estate subject to a condition subsequent. In other words, the UEP had both a reversionary interest, which vests upon the death of a claimant, and the possibility of reverter, which would only vest if a claimant sold, mortgaged, or abandoned the property. *See* Restatement of Property: Future Interests intro. n. & § 164 (1936).

7. The Utah Occupying Claimants Act provides the following remedy once the court determines that an occupier had color of title and made valuable improvements in good faith:

The plaintiff in the main action may thereupon pay the appraised value of the improvements and take the property, but should he fail to do so after a reasonable time, to be fixed by the court, the defendant may take the property upon paying its value, exclusive of the improvements. If this is not done within a reasonable time, to be fixed by the court, the parties will be held to be tenants in common of all the real estate, including the improvements, each holding an interest proportionate to the values ascertained on the trial.

Utah Code Ann. § 57–6–3.

remedy under Arizona law. Similarly, if on remand, the trial court determines that some or all of the Utah claimants did not have a good faith belief in a life estate, we must determine if the court properly granted these claimants an enrichment equitable remedy under Utah law.

■ The UEP argues that the trial court erred in granting claimants equitable relief for two reasons: first, a court cannot assess the equities between religious entities; and, second, because claimants knew that the UEP owned the land, there is nothing inequitable about the UEP's keeping the improvements without compensating the claimants. Before addressing these issues, we note that we will analyze the trial court's equity ruling under both Arizona and Utah law because the court's equitable remedy affects real property in both Arizona and Utah. *See* Restatement (Second) of Conflicts of Law § 235 (1971) (providing that existence of equitable interest in land is usually governed by local law of situs of property). Therefore, we review the ruling affecting Arizona land under Arizona law and the ruling affecting Utah land under Utah law.[8] Even though we apply the substantive law of two states, we still apply our own standard of review for all claims because standard of review is an issue inextricably tied to the forum, as we have previously noted. *See State v. Thurman*, 846 P.2d 1256, 1266–67 (Utah 1993). We now turn to our analysis.

■ The UEP first argues that the religious context of this case should prohibit a court from applying unjust enrichment principles. Essentially, the UEP argues that balancing the equities between the UEP and claimants is tantamount to judging the fairness of the UEP's religious practices and is therefore prohibited. We first note that under our Utah precedents, an issue of law, such as this, is reviewed for correctness and without deference to the trial court. *See Pena*, 869 P.2d at 936. On this law, we find nothing that would suggest that courts are not competent to hear cases involving religious entities.

■ Under both Arizona and Utah law, courts have broad authority to grant equitable relief as needed. *See Murdock–Bryant Constr., Inc. v. Pearson*, 146 Ariz. 48, 703 P.2d 1197, 1202 (1985); *see also Arizona v. Arizona Pension Planning*, 154 Ariz. 56, 739 P.2d 1373, 1375 (1987) (en banc); *Commercial Cornice & Millwork, Inc. v. Camel Constr. Servs. Corp.*, 154 Ariz. 34, 739 P.2d 1351, 1356 (Ct.App.1987); *American Towers Owners Assoc., Inc. v. CCI Mechanical*, 930 P.2d 1182, 1192–93 (1996); *Concrete Prods. Co. v. Salt Lake County*, 734 P.2d 910 (Utah 1987); *Baugh v. Darley*, 112 Utah 1, 184 P.2d 335 (1947). And nothing in the general rules of equity applicable in both states prohibits a court from deciding an equity case because the parties are religious entities. The UEP has cited no Arizona or Utah law suggesting that a court should limit the application of the doctrine of unjust enrichment solely because of the religious nature of the relationship and motivation of the UEP and claimants. And federal constitutional law imposes no such limitation. United States Supreme Court precedent suggests that courts may entertain property disputes between religious organizations. In *Presbyterian Church*

---

8. Although the Utah and Arizona laws of unjust enrichment are very similar, we apply each state's law in deference to the general rule that the law of the situs applies. We also note that Arizona law recognizes the validity of a foreign state's rulings affecting Arizona land. In *Day v. Wiswall*, 11 Ariz.App. 306, 464 P.2d 626 (1970), the Arizona Supreme Court analyzed whether a foreign decree requiring a defendant to convey Arizona land or an interest therein is entitled to full faith and credit. *See id.* at 629. Concluding that an Arizona court would give such a decree full faith and credit, the court stated:

> If the defendant is personally before a court of equity, why doesn't the court have power to order him to convey foreign land? Such a decree is an effective judgment and determines conclusively his obligation to convey. This obligation remains binding on the defendant wherever found. Such a decree ought to be entitled to full faith and credit at the situs of the land.

*Id.* Here, there appears to be no question that we have power to determine the parties' interest in land in Arizona.

*in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the Court stated:

> Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. But ... the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

*Id.* at 449, 89 S.Ct. 601. The limitations of which the Supreme Court spoke have no application here because no question of church doctrine is central to this case. We therefore conclude that in Arizona and Utah nothing prevents a civil court from hearing an ordinary equity case between religious entities or factions, or between a religious entity and a private litigant.[9]

The UEP's second argument is that because the claimants knew they did not own the land, there is nothing inequitable about the UEP's keeping the improvements without compensating claimants. We first address the standard of review. The determination that the UEP was unjustly enriched by the claimants is a mixed question of law and fact. We uphold a lower court's findings of fact unless the evidence supporting them is so lacking that we must conclude the finding is "clearly erroneous." *See Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989) (citing Utah R. Civ. P. 52(a)). As stated earlier, we assume competent and substantial evidence supported the trial court's findings because appellant did not provide a transcript on appeal. *See Goodman* 589 P.2d at 760. In contrast, we review a trial court's conclusions as to the legal effect of a given set of found facts for correctness. *See Pena*, 869 P.2d at 936. Although we review legal questions for correctness, we may still grant a trial court discretion in its application of the law to a given fact situation. As we explained in *Pena*, we decide how much discretion to give a trial court in applying the law in a particular area by considering a number of factors pertinent to the relative expertise of appellate and trial courts in addressing those issues. *See id.* at 938–39. Factors weighing in favor of broad discretion include: (i) whether "the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out"; (ii) whether "the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative"; and (iii) whether "the trial judge has observed 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." *Id.* at 939. A factor weighing against broad discretion is whether there are reasons of policy that require standard uniformity among trial courts addressing the question. *See id.*

We will address each of the *Pena* factors to determine the degree of discretion appellate courts should confer on trial courts when reviewing the legal conclusion that a set of facts does or does not warrant a conclusion that unjust enrichment has been shown. First, the facts underlying an unjust enrichment claim are often complex and vary greatly from case to case. Indeed, by its very nature, the unjust enrichment doctrine developed to handle fact situations that did

---

9. In declining to adopt the UEP's assertion that the religious context of the parties' relationship precludes an equitable award, we do not intend to avoid considering the effect of the parties' religious relationship on the appropriateness of the trial court's award, an issue raised by the UEP. However, we will consider that question, infra, when we determine the constitutionality of the district court's decision.

not fit within a particular legal standard but which nonetheless merited judicial intervention. *See* Restatement of Restitution, intro. n. (1937) (noting that narrow early common law causes of actions posed difficulties and required creation of chancery courts because "there were many situations in which one justly entitled to recover was not able to do so"). Because the fact patterns in unjust enrichment cases are generally complex and varying, the first *Pena* factor favors providing the trial court with broad discretion in applying the law to fact situations.

The second *Pena* factor addresses whether appellate courts have sufficient experience with an area of law and the situation to which the law applies that they are capable of articulating clearly and definitely the outcome determinative factors. It is true that the unjust enrichment doctrine has ancient roots, and courts have had a great deal of opportunity to apply it. However, the court's ability to state clearly the outcome-determinative factors remains elusive. The Arizona Supreme Court, in discussing the equitable rules it applies, and which we apply here, notes the rules' indeterminativeness:

> The circumstances of this case are somewhat unique.... The Restatement of Restitution ... does not cover the factual circumstances presented by the case at bench. This is not determinative, however, because the remedy of restitution is not confined to any particular circumstance or set of facts. It is, rather, a flexible, equitable remedy available whenever the court finds that "the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity" to make compensation for benefits received.
>
> We have also recognized the rationale for restitutionary relief, stating that restitution ... is available "as a matter of reason and justice from the acts and conduct of the parties and circumstances surrounding the transactions, ... and [is] imposed for the purpose of bringing about justice without reference to the intentions of the parties."

*Murdock–Bryant Constr.*, 703 P.2d at 1202 (citations omitted); *see also Commercial*

*Cornice & Millwork*, 739 P.2d at 1356; *Arizona Pension Planning*, 739 P.2d at 1375. We cannot adequately predict in any detail the elements in a situation such as the present that will or will not definitely merit an unjust enrichment remedy. Therefore, this *Pena* factor favors granting the court below a broad degree of discretion in applying the law.

The third *Pena* consideration is whether non-record evidence, such as demeanor, is available to the trial court and not the appellate court. Our discussion of the first two factors indicates that the record in an unjust enrichment case generally will not reflect considerations crucial to a trial court's ruling. This is particularly true when the trial court hears contradictory evidence from witnesses about the transaction's circumstances and must examine the relevance of each party's acts and conduct, and assess credibility and demeanor. The present case presents an unusual circumstance: the UEP did not provide a copy of the transcript from the six-week trial. This significantly impairs this court's ability to understand all the facts relevant to the trial court's ruling and gives us a further reason to conclude that in this case this factor favors broad discretion.

The fourth *Pena* factor, one countervailing to those favoring broad discretion, asks if there are policy reasons requiring uniformity among trial courts addressing these issues in similar fact circumstances. This factor seems weak in this case. First, fact situations will vary greatly in most unjust enrichment cases. Second, such a finding will not generally implicate substantial constitutional interests. *See Pena*, 869 P.2d at 938–39. We therefore find nothing here that would outweigh the factors favoring broad discretion. Unjust enrichment law developed to remedy injustice when other areas of the law could not. Unjust enrichment must remain a flexible and workable doctrine. Therefore, we afford broad discretion to the trial court in its application of unjust enrichment law to the facts.

We now turn to our analysis of the trial court's application of the law. Ari-

zona recognizes the equitable remedy of unjust enrichment and generally provides that "'[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" *Murdock–Bryant Constr.*, 703 P.2d at 1202 (quoting Restatement of Restitution § 1 (1937)). A person is unjustly enriched if (i) he received a benefit, and (ii) his retention of that benefit would be unjust. *See Flooring Systems, Inc. v. Radisson Group, Inc.*, 160 Ariz. 224, 772 P.2d 578, 581 (1989) (en banc). We find that the trial court correctly concluded that claimants proved both elements.

Regarding the first element, the trial court found: "There can be no doubt from the evidence presented that [claimant] has conferred a benefit on the UEP by improving the lot." Arizona law defines a benefit as "any form of advantage." *Artukovich & Sons, Inc. v. Reliance Truck Co.*, 126 Ariz. 246, 614 P.2d 327, 329 (1980) (en banc). In making its finding, the court relied on evidence showing that the claimants spent a considerable amount of money and time improving the UEP land, that these improvements increased the value of the land, and that the UEP will benefit from the increased value. We agree that this evidence supports the finding that the UEP received some advantage, and, thus, a benefit.

The claimants must also show that the UEP's retention of these benefits would be unjust. The UEP argues that because the claimants knew that the UEP owned the land and because the claimants intended to "donate" the improvements, they cannot recover. We disagree.

 In determining whether it would be unjust to allow the retention of benefits without compensation, Arizona law provides that:

> a court need not find that the defendant intended to compensate the plaintiff for the services rendered or that the plaintiff intended that the defendant be the party to make compensation. This is because the duty to compensate for unjust enrichment is an obligation implied by law without reference to the intention of the parties. *What is important is that it be shown that it was not intended or expected that the services be rendered or the benefit conferred gratuitously, and that the benefit was not "conferred officiously."*

*Murdock–Bryant Constr.*, 703 P.2d at 1203 (emphasis added) (internal citation omitted) (quoting *Pyeatte v. Pyeatte*, 135 Ariz. 346, 661 P.2d 196, 203 (Ct.App.1983)); *see also Flooring Systems*, 772 P.2d at 581. Thus, under Arizona law, the trial court had to find that (i) services were conferred, (ii) the services were not conferred "officiously," and (iii) it was not intended that the services were "gratuitously" conferred. As we explained above, the trial court found that the claimants conferred a benefit on the UEP—they rendered services by improving the UEP lots.

As to the second element, the claimants plainly did not confer the services officiously. "Officiousness means interference in the affairs of another not justified by the circumstances under which the interference takes place." Restatement of Restitution § 2 cmt. a (1937). Thus, an officious person is one who "thrust[s] benefits upon others." *Id.* Here, the claimants did not interfere or thrust benefits on the UEP. To the contrary, the UEP encouraged the claimants to improve the land. The trial court found:

> There can also be no doubt that the trust was aware of the benefit as its representatives encouraged the construction and the improvement of the lot by the occupant and watched the building going in. The issue is whether, given the facts of this case, it would be inequitable to allow the UEP to retain the benefit without compensation.... The Court is of the opinion that such a result would be inequitable.

Finally, the claimants did not confer their services gratuitously. One renders services gratuitously if at the time they were rendered, there was no expectation of "a return benefit, compensation, or consideration." *Webster's New Int'l Dictionary* 992 (3d ed.1961); *see also* 66 Am.Jur.2d, Restitution

§ 26 (1973). We conclude that because the claimants built the improvements with the intention that they could occupy them for their lifetimes, they did not confer them gratuitously.

■ The Restatement of Restitution, which Arizona courts follow in the absence of contrary authority, *see Bank of America v. J. & S. Auto Repairs,* 143 Ariz. 416, 694 P.2d 246, 248 (1985), is instructive in determining whether one rendered services gratuitously. Section 40 provides:

> A person who has rendered services to another ... is entitled to restitution therefor if the services were rendered ... in the mistaken belief, of which the other knew or had reason to know, that the services would inure to the benefit of the one giving them....

Restatement of Restitution § 40 (1937). Thus, one who renders services with the reasonable expectation of a returned benefit does not render the services gratuitously. Section 42 of that Restatement, which limits a party's right to recovery for improvements to land,[10] specifies that section 40 applies when the true owner, "having notice of the error and of the work being done, stands by and does not use care to prevent the error from continuing." *Id.* § 42 cmt. b. A comment to section 40 clarifies that an owner "cannot retain a benefit which knowingly he has permitted another to confer upon him by mistake." *Id.* § 40 cmt. d.

The trial court concluded that the claimants "expected to use the property into the foreseeable future" and "[a]s a result [they] invested lots of money and time in the improvement of the property." The court also found that the claimants improved the land with the knowledge and encouragement of the UEP and with the understanding that they could remain on the land for their lifetimes. The court further indicated that the UEP failed to disabuse claimants of their beliefs that they could remain on the land for their lifetimes. The court stated:

> The UEP must bear a large share of the blame for the confusion as to the terms of occupancy since it did not communicate to [claimants] directly the conditions of [their] occupancy ... even though the trust was engaged in a long term and wide spread program of settling its people on UEP lands. It would have been easy to prepare a list of conditions of occupancy and to distribute the list to those preparing to invest heavily in improvements with the encouragement and agreement of the trust.

Applying the law to these facts, we conclude that the trial court's disposition was adequately supported by the evidence and was consistent with the Arizona substantive law. We therefore find that the trial court did not abuse its discretion in requiring the UEP to allow claimants to live on the land for their lifetimes or to compensate them for the improvements.

■ We next consider the trial court's unjust enrichment ruling under Utah law, as that law governs the claims of any Utah residents who may not be covered by the Occupying Claimants Act or for whom an equitable remedy is more favorable. Utah law, like Arizona's, recognizes the remedy of unjust enrichment. A party may prevail on

10. Section 42(1) of the Restatement of Restitution, *governing improvements upon land or chattels,* provides:

> Except to the extent that the rule is changed by statute, a person who, in the mistaken belief that he or a third party on whose account he acts is the owner, has caused improvements to be made upon the land of another, is not thereby entitled to restitution from the owner for the value of such improvement; but *if his mistake was reasonable,* the owner is entitled to obtain judgment in an equitable proceeding or

> in an action for trespass ... only on condition that he makes restitution to the extent that the land has been increased in value by such improvements, or for the value of labor and materials employed in making such improvements, whichever is least. Restatement of Restitution § 42(1) (1937) (emphasis added). Thus, if a person who made improvements had a reasonable belief of ownership, the true owner may eject the party who made the improvements only after paying restitution for the improvements.

an unjust enrichment theory by proving three elements:

> " '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.' "

*American Towers Owners*, 930 P.2d at 1192 (citations omitted). Although these elements are phrased differently than Arizona's, we find the analysis to be much the same.

Regarding the first two elements, the trial court, as discussed above, found that claimants conferred a benefit by improving the property and that the UEP knew about, and, indeed, encouraged the improvements.

We addressed the third element in *Baugh v. Darley*, 112 Utah 1, 184 P.2d 335 (1947). This court stated:

> Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another. The benefit may be ... beneficial services conferred....
>
> ....
>
> Services officiously or gratuitously furnished are not recoverable. Nor are services performed by the plaintiff for his own advantage, and from which the defendant benefits incidentally, recoverable.

*Id.* at 337 (internal citations omitted). Here, the claimants improved the land in reliance upon the UEP's representations that they could live on the land for the rest of their lives. Even though the claimants intended to benefit from the improvements by occupying them during their lifetimes, the claimants' services still conferred a direct, not incidental, benefit on the UEP. Thus, we uphold the trial court's equitable remedy for all claimants, both those occupying land in Arizona and Utah.

The UEP next argues that the trial court's particular equitable remedy violates both article I, section 4 of the Utah Constitution and the First Amendment to the United States Constitution because the ruling burdens the free exercise of its members' religious beliefs. Specifically, the UEP asserts that the ruling is unconstitutional because it measures "religious expression against secular standards of fairness." [11]

When presented with a constitutional challenge to a law, we presume the law is valid. *See Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 920 (Utah 1993). A party mounting such a challenge bears a heavy burden to overcome this presumption, and " 'we resolve any reasonable doubts in favor of constitutionality.' " *Dennis v. Summit County*, 933 P.2d 387, 389 (Utah 1997) (quoting *Society of Separationists*, 870 P.2d at 920). Moreover, when a party asserts claims under both the Utah and federal Constitutions, this court ordinarily first determines the issue under the Utah Constitution and only resorts to the federal Constitution if the state constitution is not dispositive. *See West v. Thomson Newspapers*, 872 P.2d 999, 1004–07 (Utah 1994).

With this in mind, we first address whether the trial court's equitable ruling violates article I, section 4 of the Utah Constitution. It provides:

> The rights of conscience shall never be infringed. The *State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof;* no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property

11. The UEP also argued that the trial court's ruling violated the Religious Freedom Restoration Act of 1993. *See* 42 U.S.C. §§ 2000bb to 2000bb–4. However, we do not address this claim because the United States Supreme Court recently ruled that the act was unconstitutional. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997).

shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

Utah Const. art. I, § 4 (emphasis added). The UEP argues this section provides greater protection for religious institutions than the federal constitution. Accordingly, it asks this court to hold that any law that in any way burdens free exercise violates article I, section 4 unless the proponent of the law shows that it is supported by a compelling state interest and is the least restrictive means of accomplishing that end.

■ This proposed test does not come from the language of the constitution or from our case law, which has never addressed this question. Rather, the UEP grounds its proposed test on two United States Supreme Court decisions under the First Amendment's Free Exercise Clause, *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). It is noteworthy, however, that the Supreme Court's most recent cases decided under the Free Exercise Clause state that the compelling interest test of *Yoder* and *Sherbert* is not the prevailing federal constitutional test. Rather, under the Free Exercise Clause of the First Amendment, a state law that incidentally burdens the exercise of religion is not unconstitutional so long as the law is not intended to burden free exercise, is of general applicability, and is otherwise valid. *See Employment Div. Dept. of Human Res. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (stating that Supreme Court decisions "have consistently held that the right of free exercise does not

relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes))'" (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)).[12]

We have never determined whether the free exercise clause of article I, section 4 of the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution. And we do not decide that question today: even if we assume, arguendo, that the compelling interest test the UEP proposes applies, the UEP cannot prevail on the facts of this case. Because the UEP's state constitutional claim fails under the more rigorous compelling state interest test, we need not consider the UEP's federal First Amendment claim because it is governed by the less rigorous test articulated in *Smith*. *See* 494 U.S. at 879, 110 S.Ct. 1595.

■ We now turn to an application of the compelling state interest test. Under the test advanced by the UEP, a facially neutral law may "offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Yoder*, 406 U.S. at 220, 92 S.Ct. 1526. However, a law that burdens free exercise is nonetheless constitutional if it furthers a compelling state interest and is the least restrictive means of accomplishing that interest. *See Yoder*, 406 U.S. at 214–15, 92 S.Ct. 1526; *Sherbert*, 374 U.S. at 406–08, 83 S.Ct. 1790; *see also Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). For purposes of applying this test only, we will assume that the trial court's ruling burdened the UEP members' free ex-

---

12. In *Smith*, the Court explained that the only decisions in which it had found a neutral, generally applicable law violated the First Amendment involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as ... the rights of parents ... to direct the

education of their children, *see Wisconsin v. Yoder*, 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).
*Smith*, 494 U.S. at 881, 110 S.Ct. 1595.

ercise rights.[13] Thus, we must determine if the court's ruling is the least restrictive means of accomplishing a compelling state interest. We conclude that it is.

A compelling state interest is a "paramount" interest, one of "the highest order." *Sherbert,* 374 U.S. at 407, 83 S.Ct. 1790. The UEP argues that the interest at issue is requiring one church body to maintain religious dissenters on church lands or monitoring the fairness of a religious program, and it argues that neither of these interests is compelling. The UEP, however, misstates the relevant interest.

 We conclude that the state's interest here revolves around the judicial system, not the specific results of the judicial action. This is because the UEP contends that *no* remedy could be returned by the trial court on these claims without violating the state constitution. The state has a compelling interest in ensuring that all parties are able to resolve legal disputes before a neutral tribunal. Utah's open courts provision states: "All courts shall be open, and every person, for any injury done to him in his person, property or reputation shall have a remedy by due course of law." Utah Const. art. I, § 11. This provision ensures that courts are to be accessible to all for the resolution of their disputes and makes clear that this right to come into court is a fundamental value of our governmental compact. *See Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 675 (Utah 1985) ("The clear language of the section guarantees ac-

cess to the courts and a judicial procedure that is based on fairness and equality."); *Bracken v. Dahle,* 68 Utah 486, 251 P. 16, 20 (1926) ("The right to apply to the courts for relief for the perpetration of a wrong is a substantial right."). While this clause may not guarantee any specific remedy, it certainly guarantees access to the courts. *See generally Berry,* 717 P.2d at 675.

 If we were to accept the UEP's claim that we should refuse to resolve the claimants' case solely because of the assertion that Utah's courts cannot resolve disputes between religious entities, that refusal would deny this fundamental right to the claimants. In addition, such a refusal of a remedy alone might constitute an action violative of state or federal Establishment and Free Exercise Clauses. As one scholar has reasoned:

> Although the application of a unique set of legal principles developed in the context of the first amendment [and article I, section 4] jurisprudence may be required to evaluate the impact of governmental activity on religious concerns, these unique principles should not apply for resolving internal religious disputes. In such a dispute, the most important value to maintain is equality between religious factions. Without equality of treatment, courts risk establishing one religious faction at the expense of the free exercise of the other religious faction.

Patty Gerstenblith, *Civil Court Resolution of Property Disputes Among Religious Organi-*

---

**13.** Both parties' briefs addressed whether the trial court's ruling imposed a "substantial burden" on free exercise. The claimants cite a Tenth Circuit case for its argument that before establishing a First Amendment violation, a party must first show a substantial burden on religious exercise. *See Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.), *cert. denied,* 515 U.S. 1166, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995). The Tenth Circuit, however, decided *Werner* under the Religious Freedom Restoration Act ("RFRA"), which Congress passed in 1993. *See* 42 U.S.C. §§ 2000bb to 2000bb–4. RFRA provided:

> Government may *substantially burden* a person's exercise of religion only if it demon-

strates that application of the burden to the person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b) (emphasis added). Even though both parties integrate the "substantial burden" requirement into their constitutional analyses, this is not necessary. We need not decide if the compelling state interest standard applies unless there is a showing that the law imposed a "substantial burden" on free exercise. We can assume for this case only that the compelling interest test applies upon a showing that the law imposes *any* burden on free exercise.

*zations,* 39 Am. U.L.Rev. 513, 515 (1990). Another scholar summarized the problem as follows:

It would be simple indeed to deal with all these conflicts with a policy of noninvolvement.... But courts serve neither the church nor its members by placing their affairs in a special law-free zone. Law free is also lawless, and the consequence is that neither the faithful, nor the church or those with which it deals, can rely on the other parties playing by the rules, for there are then no enforceable rules.

Ira M. Ellman, *Driven from the Tribunal: Judicial Resolution of Internal Church Disputes,* 69 Cal. L.Rev. 1378, 1444 (1981). We conclude that courts must treat property disputes between religious factions "in the same manner they treat disputes among other voluntary associations." *Gerstenblith, supra,* 39 Am. U.L.Rev. at 520. In the present case, by resolving the dispute between the UEP and claimants, the trial court furthered the compelling state interest in keeping the courts open. Therefore, we find the UEP's claim would fail even if we were to adopt the test it suggests. The trial court's award was carefully crafted to be the least restrictive means available to further the state's compelling interest. The remedy provided the claimants redress for their injuries in a manner that minimizes the burden upon free exercise. The court's ruling allows the UEP to force the claimants off the UEP land at any time. The UEP need only compensate claimants first for the benefits it received. The court's adjudication of this matter did not violate article I, section 4.

We now turn to the claimants' cross appeal, which urges this court to reverse the trial court and hold that the UEP is a private trust, not a charitable trust. The claimants make this assertion because the trial court's conclusion that the UEP trust is charitable denied claimants standing to assert their breach of fiduciary duty, accounting, and distribution claims. *See* Restatement of Restitution § 391 (1959).

The trial court based its conclusion that the trust is charitable on a number of facts: the trust states that it is charitable; the document designated no specific beneficiaries; that members of the trust have no entitlement to benefits because the trustees have discretion to distribute benefits as they see fit; and future members' consecrations to the trust buy them nothing. Specifically, the court stated:

The Court has found, based on the evidence presented at trial and the clear language and unambiguous portions of the declaration, that the creators of the trust were motivated by their religious beliefs to create a trust to hold title to property donated by adherents to their religious faith, including themselves, and to engage in business enterprises for the benefit of the followers of the Work.

 The trial court relied on extrinsic evidence relating to the intentions of the trusts' original settlors. However, in determining whether a trust is charitable, a court must look to the language of the trust instrument and may not look beyond it unless the instrument's language does not resolve the issue. *Cf. Olivas v. Board of Nat'l Missions of Presbyterian Church,* 1 Ariz.App. 543, 405 P.2d 481, 485 (Ariz.Ct.App.1965); *see also* Restatement (Second) of Trusts § 38 (1959) (providing that parol evidence rule applies to interpretation of trusts). Therefore, we review the language of the trust first. This review of the trust instrument is a question of law. *See In re Ferguson,* 929 P.2d 33, 35 (Colo.Ct.App.1996).[14] If we find no ambiguity, we need not consider the extrinsic evidence relied on by the trial court.

 "A charitable trust is a fiduciary relationship with respect to property arising

---

14. Because there is no conflict between the Utah and Arizona law governing this trust, we choose to apply Utah law. *See Morris v. Sykes,* 624 P.2d 681, 684 (Utah 1981) (holding that where no significant differences exist between Utah law and law of other states, "the court *may* properly apply Utah law in the absence of an affirmative showing that the law of [the other state] is different"(emphasis added)). However, we look to and adopt the reasoning of Arizona cases we find persuasive.

as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with property for a charitable purpose." Restatement (Second) of Trusts § 348; *see also State ex rel. Goddard v. Coerver*, 100 Ariz. 135, 412 P.2d 259, 263 (1966). "A fundamental distinction between [private trusts and charitable trusts] is that in a private trust property is devoted to the use of specified persons who are designated as beneficiaries of the trust; whereas a charitable trust has as a beneficiary a definite class and indefinite beneficiaries within the definite class, and the purpose is beneficial to the community." *Olivas*, 405 P.2d at 485. Thus, a charitable trust has two essential requirements: indefinite beneficiaries and a purpose beneficial to the community.

 We turn to the first element, the indefiniteness of the beneficiaries. In order to qualify as a charitable trust, the trust instrument must indicate that "the persons who are to benefit are ... of a sufficiently large or indefinite class so that the community is interested in the enforcement of the trust." Restatement (Second) of Trusts § 375. In a charitable trust, "the beneficial interest is not given to individual beneficiaries, but the property is devoted to the accomplishment of purposes beneficial to the community." *Id.* § 364 cmt. a. Thus, if a trust only names specific beneficiaries, the trust is not charitable even if it has a charitable purpose such as relieving the named beneficiaries from poverty, providing them education, or promoting their religious welfare. *Cf. id.* § 375 cmt. b; *id.* § 371 cmt. f (providing that "a trust for the religious benefit of persons designated by name ... is not a charitable trust").

The Declaration of Trust provides:

it is understood and agreed that *we and such other members as may hereafter come into said association are associated together merely and solely for purposes of being cesti que trustents [sic] of the trust hereby created,* thus being entitled to equitable and beneficial interests of all profits and property, both personal, real and mixed, of the trust estate created, in accordance with their just wants and needs as determined from time to time by the Board of Trustees and as the trust estate may be able to respond thereto.... *Membership in the trust estate is established for the signers of this instrument ... by conveyance to the trust estate of the following property....* Evidence of membership shall be shown in the books of the association.

Further and additional membership shall be established and added by the consecration of such property....

Declaration of Trust (Nov. 9, 1942) (emphasis added). Thus, the UEP trust document states that the signers of the instrument became trust members and associated "for purposes of being cesti que trustents of the trust." Cestui que truste are "[t]he beneficiar[ies] of a trust." *Blacks Law Dictionary* 229 (6th ed.1990). From its inception, the trust benefitted specific individuals. Therefore, the trial court erred in concluding that the trust had no specific beneficiaries and was charitable.

The trial court also relied on several other factors in concluding that the trust was charitable. These factors were that (i) the members received nothing for their consecrations, (ii) the document states that the trust is charitable, and (iii) the trust grants the trustees sole discretion to distribute benefits. We have reviewed these factors and conclude that as a matter of law, none of them make the trust charitable.

 First, we cannot agree with the trial court that members' consecrations buy them nothing. The trust instrument clearly contemplates that beneficiaries must consecrate property to benefit from the trust. But that does not make it charitable. One scholar has noted:

If members of a large group make contributions toward a common fund, to be administered by trustees, the income and capital to be used to furnish help to the

contributors or their relatives if they are sick, disabled, or out of work, the courts do not treat the trust as charitable, but rather as a private trust or as giving contractual rights in the nature of insurance. They lay stress on the fact that the [beneficiaries] have purchased their benefits. It is said sometimes that in the case of a true charitable trust, those to be aided must be suppliants, and must take their benefits gratuitously.

George E. Bogert, *The Law of Trusts* 138 (4th ed.1963). The UEP trust gives a beneficial interest to named individuals—the members. To become a member, an individual must consecrate property to the trust. We conclude that under these circumstances, the consecration requirement is not indicative of a charitable trust.

■ Second, we find the trust's declaration to be nondeterminative under the circumstances. The declaration states, "The purpose and object of the trust shall first be charitable and philanthropic." Declaration of Trust, ¶ VIII. In an Arizona case in which the language of a testamentary trust attempted to devise property to specific heirs and to create a charitable trust with the residue of the estate, the Arizona Supreme Court stated:

> although the clear intention of the testatrix was that the trustees ... should apply the residue of her estate in ways beneficial to the Town of Paonia, or the Paonia schools, her good intentions alone cannot create a valid charitable trust where the language of the clause makes it possible for the property to be devoted to purposes other than "charitable" as defined by the law.

*In re Hayward's Estate*, 65 Ariz. 228, 178 P.2d 547, 550 (1947). This reasoning applies here. Even though the settlors called the trust charitable, they structured the trust so that it would benefit specific individuals. In short, the settlors declared intentions cannot overcome other operative language in the trust making it a private trust.

■ Finally, we address the trial court's conclusion that the trust is charitable because the trust grants the trustees sole discretion to distribute benefits. We agree that the trust language bestows such discretion; however, we disagree with the trial court's conclusion that vesting discretion in a trustee makes a trust charitable. The Restatement (Second) of Trusts provides that a settlor may create a discretionary trust. Comment d to section 128 provides: "By the terms of the trust it may be provided that the trustee shall pay to or apply for a beneficiary only so much of the income and principal or either *as the trustee in his discretion* shall see fit to pay or apply." Restatement (Second) of Trusts § 128 cmt. d (emphasis added). Thus, nothing prohibits a settlor from giving the trustee of a private trust discretionary power over distributions. Because that trust names specific beneficiaries and because nothing else in the trust overcomes the general rule that naming specific beneficiaries render a trust private, we conclude the UEP trust is private.

In conclusion, we uphold the trial court's equitable ruling allowing claimants to remain on the land for their lifetimes or requiring the UEP to compensate the claimants for the benefit it received if the UEP seeks to remove claimants. However, we find that the trial court erred in its interpretation of the Utah Occupying Claimants Act and that the findings are insufficient for us to determine whether any or all of the claimants have life estates. Further, we find that the trial court erred in ruling that the UEP trust is a charitable trust. Therefore, we remand that issue to the trial court for further proceedings consistent with this opinion.

HOWE, C.J., DURHAM, A.C.J., and RUSSON, J., concur in Justice ZIMMERMAN's opinion.

STEWART, J., dissents.