2019 UT App 41

# THE UTAH COURT OF APPEALS

THE LAUMALIE MA'ONI'ONI FREE WESLEYAN CHURCH OF TONGA,
Appellant,
*v.*
ETIMANI MA'AFU, THE ROCKY MOUNTAIN CONFERENCE OF
THE UNITED METHODIST CHURCH, THE TONGAN UNITED
METHODIST CHURCH, and THE BOARD OF TRUSTEES OF THE
UNITED METHODIST CHURCH
Appellees.

Opinion
No. 20170637-CA
Filed March 21, 2019

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 120908228

Robert C. Avery, Nathan E. Burdsal, and
Hutch U. Fale, Attorneys for Appellant

Geoffrey C. Haslam and Kristen C. Kiburtz,
Attorneys for Appellee Etimani Ma'afu

Gary L. Johnson, Zachary E. Peterson, and Richard
A. Marsh, Attorneys for Appellees the
Rocky Mountain Conference of the United
Methodist Church, the Tongan United Methodist
Church, and the Board of Trustees of the
United Methodist Church

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

APPLEBY, Judge:

¶1     This case involves a church property dispute between
dissident members of the Tongan United Methodist Church

(TUMC) and various representatives of the United Methodist denomination, including the Rocky Mountain Conference of the United Methodist Church (the RMC).[1] TUMC is a Utah nonprofit corporation functioning as a local United Methodist congregation since 1978. The RMC is the United Methodist denomination's regional representative in Utah.

¶2 In 2012, a group of TUMC members purported to amend TUMC's articles of incorporation by removing any reference to the United Methodist Church and changing the corporation's name to the Laumalie Ma'oni'oni Free Wesleyan Church of Tonga (Free Wesleyan).[2] Prior to these changes, Etimani Ma'afu was the president of TUMC's board of directors, but the amendments purported to remove him from that position. Free Wesleyan filed a claim against Ma'afu in the district court, seeking an injunction forbidding him from acting on behalf of the corporation and a declaratory judgment that Free Wesleyan was the only entity entitled to control church property.

¶3 The RMC, joined by various parties affiliated with the United Methodist Church, filed a separate lawsuit arguing that Free Wesleyan's actions were invalid and unenforceable because the dissident members did not comply with TUMC's governing documents. The RMC also claimed that, even if the dissident members' actions were proper, those members were not entitled to use the local church property because it was held in trust by

---

1. Appellees include Etimani Ma'afu, the Tongan United Methodist Church, and the Board of Trustees of the United Methodist Church.

2. TUMC and Free Wesleyan are actually the same entity because TUMC became Free Wesleyan when TUMC's dissident members purportedly amended TUMC's articles of incorporation. In this opinion, we refer to that entity by the name it was using at the time of the relevant events.

TUMC for the benefit of the United Methodist denomination. The RMC's case was consolidated with Free Wesleyan's case.

¶4    After discovery, the district court granted Ma'afu and the RMC's joint motion for summary judgment, determining that Free Wesleyan's actions were not authorized under TUMC's governing documents. The court then entered a final judgment restoring TUMC "to how it existed prior to the improper corporate acts."

¶5    Free Wesleyan appeals. We affirm.


BACKGROUND

¶6    The United Methodist Church is "a 'connectional' network of distinct, but affiliated entities known as local churches, charges, conferences, boards, commissions and agencies." The denomination has a "hierarchical" structure[3] consisting of multiple tiers, and each affiliated entity is subject to a higher authority within that multi-tier structure. Thus, although local churches are incorporated as individual entities, they are members of a "regional conference," which charters the local church and oversees the local congregation.

¶7    Within the United Methodist Church, each of the affiliated entities is required to follow the denomination's

---

3. Hierarchical churches are "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 110 (1952). In such a denomination, "the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Watson v. Jones*, 80 U.S. 679, 726–27 (1871).

governing document: The Book of Discipline (the Discipline). In addition to detailing religious doctrine, the Discipline establishes requirements for governance of the local churches and procedures for implementing changes at the local level.

¶8 Under the Discipline, decisions regarding local churches are made by two groups: the Charge Conference and the Church Conference. The Charge Conference is the "connecting link between the local church and the general Church." That is, it serves as the local "unit in the connectional system of the United Methodist Church." The Charge Conference consists of a "church council" made up of elected local church members and "any others as may be designated in the Discipline." At annual or special meetings, the Charge Conference elects officers of the local congregation, authorizes property transfers, and makes other major decisions.

¶9 The Church Conference "encourage[s] broader participation by members of the church" by "extending the vote" on any issue generally decided by the Charge Conference "to all professing members of the local [congregation]." A Church Conference may be called "at the discretion of the district superintendent or following a written request to the district superintendent by . . . the pastor, the church council, or 10 percent of the professing membership of the local [congregation]."

¶10 The Discipline requires any meeting of the Charge Conference or the Church Conference to be called and presided over by the district superintendent. Regardless of the type of meeting, the Discipline does not authorize voting by proxy or mail-in voting. Instead, at a Charge Conference, "[t]he members present and voting at any duly announced meeting shall constitute a quorum." And at a Church Conference, the vote extends "to all professing members of the local church present at [the] meetings."

¶11    The Discipline also establishes that all "properties of the United Methodist local churches . . . are held, *in trust*, for the benefit of the entire denomination, and ownership and usage of church property is subject to the *Discipline*." The Discipline authorizes regional conferences to bring suit in their own names to protect and enforce denominational interests in matters of local church property, governance, and operations.

¶12    Utah's regional conference is the RMC. In 1978, the RMC chartered a local congregation in Salt Lake City—TUMC—and appointed a minister to oversee the congregation. Under the RMC's direction, TUMC filed its original articles of incorporation (the Original Articles) with the State of Utah. The Original Articles included these provisions: (1) "The purpose for which the corporation is organized is to conduct and operate a United Methodist Church and congregation according to the Discipline"; (2) "All title to real property bought and sold by the [c]orporation shall be in full conformity with the Discipline"; (3) "The internal affairs of the corporation shall be managed and controlled by the Board of Trustees of the corporation. The bylaws . . . may be amended by the board . . . , provided that they remain in accord with these Articles of Incorporation and with the Discipline"; (4) "The Board of Trustees shall consist of the members of the Board of Trustees of the Tongan United Methodist Church of Salt Lake City, elected and organized as prescribed in the Discipline"; and (5) "Upon dissolution, all net assets and property transfer to the [RMC]."

¶13    A provision in the Original Articles titled "Amendments" provides:

> These [Original Articles] may be amended by the vote of at least two-thirds of the members of the corporation present at the annual meeting or at a special meeting of the corporation called for that purpose.

¶14 After its incorporation, TUMC operated as a local congregation of the United Methodist Church for thirty-four years. In conformity with the Discipline, it elected officers, purchased property, and held annual Charge Conferences, presided over by the district superintendent. In 2012, as the result of a dispute between the RMC and the local congregation, a group of local leaders attempted to disaffiliate TUMC from the United Methodist Church. They proposed amendments to the Original Articles that removed any reference to the United Methodist Church or the Discipline, and changed the corporation's name to Free Wesleyan.

¶15 TUMC's corporate secretary sent a letter titled "Important Corporate Notice Regarding Proposed Amendments to Articles of Incorporation" to all local members. The letter explained the proposed amendments and directed members to vote yes or no on an attached ballot and mail it to the corporation.

¶16 When the RMC learned of the mail-in vote, it sent a letter to the local congregation informing it that the results of the vote "will not be valid and will be legally unenforceable" because the vote "does not comply" with the "process for calling and holding a church membership meeting" as established by the Discipline. The letter specified that a Church Conference must be called and presided over by the district superintendent and held in person, and that "[t]he only votes that count are those cast by eligible church members in attendance at a properly called meeting." It also stated that the proposed amendments would not "allow the new church to take the [local congregation's] property and building" because, "[u]nder the [Discipline], all church property is owned by the local church *in trust for* The United Methodist Church."

¶17 Despite the RMC's letter, the local leaders proceeded with the mail-in vote, and the proposed amendments were approved by two-thirds of the members. Based on the results, the local members purported to elect a new board of directors, and the

board filed the amended articles of incorporation (the Amended Articles) with the Division of Corporations and Commercial Code (the Division).

¶18 At the time of the mail-in vote, Ma'afu was the president of TUMC's board of directors, but he was removed from that position under the Amended Articles. Ma'afu refused to recognize the amendments and continued to use local church property and withdraw funds from the local church's account.

¶19 In response to Ma'afu's actions, on the same day the Division received the Amended Articles, Free Wesleyan filed with the district court a claim against Ma'afu seeking a declaratory judgment "with respect to the rights, status, and other legal relations between the parties." Free Wesleyan also asked for a temporary restraining order forbidding Ma'afu from representing "that he is an authorized agent of the Corporation," and sought damages for "the value of the property converted by [Ma'afu]" and an award of costs and attorney fees.

¶20 The RMC filed a motion to intervene in the case. The motion cited provisions from the Discipline that authorize the RMC "to bring suit and intervene in its own name to protect denominational interests in matters of local church governance, operations and property." It claimed that the United Methodist Church held an irrevocable trust in the local church property, and asserted that the "property is necessarily affected by the purported amendment to [the Original Articles]" and the dissident members' efforts to assume control of the property and spend the church's assets. The district court granted the motion to intervene, concluding that the RMC had "alleged a sufficient interest . . . to intervene as a matter of right."

¶21 The RMC also contested before the Division TUMC's filing of the Amended Articles. In a letter, it asked the Division to "conduct whatever investigation you deem appropriate to determine the validity of the contested filings." The RMC also

asked the Division to change the principals of the corporation back to the principals who were in place before the mail-in vote.

¶22 After receiving the RMC's objections, the Division sent a letter to counsel for the parties, stating that the Division was "unable to clearly establish whether the filings were made with authority or not." It therefore took the filings on "good faith," but placed on hold all contested changes until it received "a court order or a notarized document signed by all parties that specifically states the name of the non-profit corporation and the roster of officers and directors."

¶23 Free Wesleyan informed the Division that it intended to challenge the decision to place the changes on hold. At the Division's request, Free Wesleyan produced affidavits from its members stating that they agreed to adopt the Amended Articles. The Division then removed the "hold" and accepted the Amended Articles. A note in the Division's records says, "Although Principals still in dispute, renewal authorized."

¶24 The Division issued Free Wesleyan new "Certificates of Existence." The certificates listed the new corporate name and certified that Free Wesleyan was "authorized to transact business and was duly registered under the laws of the State of Utah," had "paid all fees and penalties owed," had filed "its most recent annual report," and had not filed "Articles of Dissolution."

¶25 Later, the RMC filed a separate district court action against Free Wesleyan, seeking a declaratory judgment that the mail-in vote was not authorized and that "its claimed results are null and void." In response, Free Wesleyan filed a motion to consolidate the RMC's action with its own. The motion said that each of the parties claim the "control and access to the same property," and "[c]onsolidation will enable one Court to adjudicate all issues that have been raised as to the Church Property in one action." It also noted that the district court would "necessarily decide" all of the parties' claims by

"determining whether the [Church] . . . properly amended its articles of incorporation and changed its name." *See* Utah Code Ann. § 78B-6-403(1) (LexisNexis 2018) ("When declaratory relief is sought all persons shall be made parties who have or claim any interest which would be affected by the declaration . . . .").

¶26   The district court granted Free Wesleyan's motion to consolidate the two actions. After discovery, the RMC and Ma'afu filed a joint motion for partial summary judgment. They argued that Free Wesleyan's actions, including electing a new board and filing the Amended Articles, were invalid because the mail-in vote did not comply with the Discipline, which, according to them, had been incorporated by reference into the Original Articles. They asked the district court to issue an order invalidating the changes and restoring the corporation's name and principals to what they had been before the mail-in vote.

¶27   Free Wesleyan opposed the motion on three grounds. First, it argued that the court lacked subject matter jurisdiction because the RMC and Ma'afu failed to exhaust their administrative remedies with the Division. Second, it asserted that the RMC and Ma'afu lacked standing because they were not members of the corporation and had no independent interest in its internal actions. Third, it argued that the Amended Articles were valid because they were approved according to the procedures detailed in the corporation's governing documents.

¶28   The district court granted the motion for partial summary judgment. It rejected Free Wesleyan's exhaustion of administrative remedies argument, stating that "the Division made no determination regarding the parties' rights, the validity of the vote by mail, or the [Amended] Articles." Thus, there was nothing "before the Court to indicate this action should be considered as an appeal from a determination made by the Division."

¶29   Next, the court determined that it "need not decide whether the RMC or [Ma'afu] would have standing to bring

their claims" because Free Wesleyan placed the validity of its actions at issue when it asserted its claims against Ma'afu. Thus, the RMC and Ma'afu had "the ability to file any relevant motions regarding the subject matter of [Free Wesleyan's] claims."

¶30    The court then analyzed whether Free Wesleyan's actions were valid under the corporation's governing documents. Recognizing the constitutional restraints of a dispute over church property, the court based its determination on "sources that do not implicate matters of church doctrine." (Citing *Jones v. Wolf*, 443 U.S. 595, 603 (1979).) The court stated that, if it were to ignore the provisions of the Discipline, Free Wesleyan's actions likely were valid. (Citing Utah Code Ann. § 16-6a-709 (LexisNexis 2013) (allowing nonprofit corporations to hold special meetings and hold votes by mail, "[u]nless otherwise provided by the bylaws").) But the court concluded the Discipline was "expressly incorporated by reference into the Original Articles." Thus, to "give full effect to all the provisions of the Original Articles," the court read "the Original Articles to require compliance with the Discipline before holding a special meeting or attempting to amend the [Original Articles]."

¶31    And because "[n]either the vote by mail nor the meeting held by the board of directors before holding the vote complied with the Discipline"—the meeting was not called by the conference superintendent nor were the voting members physically present at the meeting—"[n]one of the subsequent Corporate Actions were undertaken with authority" and were therefore invalid. After granting the motion for partial summary judgment, the court concluded that the other issues raised by the parties, "including the competing claims regarding ownership of church property," were moot.

¶32    The RMC notified the Division of the district court's decision, and the Division rescinded the Amended Articles, reinstated the Original Articles, and reverted the corporation's

name and officers of record to those in place prior to the mail-in vote. Thereafter, the district court entered a final judgment in which it invalidated Free Wesleyan's actions and "restored the corporation to how it existed prior to the improper corporate acts."

¶33   Free Wesleyan appeals.

ISSUES AND STANDARDS OF REVIEW

¶34   Free Wesleyan appeals the district court's judgment on three grounds. First, it argues the district court lacked subject matter jurisdiction because the RMC and Ma'afu failed to exhaust their administrative remedies. "[W]hether a court lacks subject matter jurisdiction due to a party's failure to exhaust administrative remedies is a question of law, reviewed for correctness." *Republic Outdoor Advert., LC v. Utah Dep't of Transp.*, 2011 UT App 198, ¶ 12, 258 P.3d 619.

¶35   Second, it argues the RMC and Ma'afu did not have standing to challenge the validity of the Amended Articles. "A standing determination is primarily a question of law, although there may be factual findings that bear on the issue." *Angel Inv'rs, LLC v. Garrity*, 2009 UT 40, ¶ 14, 216 P.3d 944 (quotation simplified). "[W]e review the district court's legal determinations for correctness but review its factual determinations with some deference." *Id.*

¶36   Third, it argues the district court erred in granting summary judgment to the RMC and Ma'afu on their claim that the mail-in vote was not valid under the corporation's governing documents. We review the district court's grant of summary judgment for correctness. *Hertzske v. Snyder*, 2017 UT 4, ¶ 6, 390 P.3d 307. Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a).

ANALYSIS

I. Exhaustion of Administrative Remedies

¶37    Free Wesleyan argues the district court lacked subject matter jurisdiction because the RMC and Ma'afu failed to exhaust their administrative remedies. We disagree. Because the Division does not make discretionary decisions regarding the validity of corporate actions, the RMC and Ma'afu were not required to exhaust any administrative remedies with it before seeking a declaratory judgment in the district court. *See Walker Bank & Trust Co. v. Taylor*, 390 P.2d 592, 595 (Utah 1964) (determining that the exhaustion of administrative remedies requirement "only applies where the discretion of an administrative officer or body, acting . . . pursuant to statutory directive, is in question").

¶38    "District courts have original jurisdiction in all matters except as limited by statute." *Osmond Senior Living LLC v. Utah Dep't of Public Safety*, 2018 UT App 218, ¶ 11 (quotation simplified). Thus, district "courts have subject matter jurisdiction over a legal claim unless adjudicative authority for that claim is specifically delegated to an administrative agency." *Id.* (quotation simplified). If adjudicative authority has been delegated to an administrative agency, "a party seeking relief must exhaust 'all administrative remedies available' before seeking judicial review." *Ramsay v. Kane County Human Res. Special Service Dist.*, 2014 UT 5, ¶ 9, 322 P.3d 1163 (quoting Utah Code section 63G-4-401(2)).

¶39    "The basic purpose underlying the doctrine of exhaustion of administrative remedies is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Maverik Country Stores, Inc. v. Industrial Comm'n of Utah*, 860 P.2d 944, 947 (Utah Ct. App. 1993) (quotation simplified). Accordingly, we require parties to

exhaust administrative remedies only "where the discretion of an administrative officer, or body, acting . . . pursuant to statutory directive, is in question." *Taylor*, 390 P.2d at 595.

¶40    Free Wesleyan argues the Division made a discretionary determination of the validity of the Amended Articles by (1) filing them and (2) issuing certificates of existence that reflected the changes they contained. But contrary to Free Wesleyan's arguments, the Division made no such determination.

¶41    Under the Utah Revised Nonprofit Corporation Act (the Act), the Division's duty to file documents is "ministerial." Utah Code Ann. § 16-6a-110(4)(a) (LexisNexis 2013). By definition, a ministerial duty "requires neither the exercise of official discretion nor judgment." *Ministerial Duty*, Black's Law Dictionary 617 (10th ed. 2014). As the Act explains,

> the [D]ivision's filing or refusal to file a document does not: (i) affect the validity or invalidity of the document in whole or in part; (ii) relate to the correctness or incorrectness of information contained in the document; or (iii) create a presumption that: (A) the document is valid or invalid; or (B) information contained in the document is correct or incorrect.

Utah Code Ann. § 16-6a-110(4)(a). Instead, the Division is required to file a document if the document satisfies certain statutory requirements. *Id.* § 16-6a-110(1) ("If a document delivered to the [D]ivision for filing satisfies the requirements of Section 16-6a-105, the [D]ivision shall file the document.").

¶42    Here, the Division confirmed to the parties that it lacked adjudicative authority. In a letter, it stated that it could not determine whether the corporate changes were made with proper authority and would therefore place the changes on hold

until it received a court order or an agreement signed by the parties. Free Wesleyan attempts to inflate the Division's authority by citing Utah Code section 16-6a-203. That provision states, "[T]he filing of the articles of incorporation by the [D]ivision is conclusive proof that all conditions precedent to incorporation have been satisfied." *Id.* § 16-6a-203(2).[4] We interpret this section to mean that when the Division files articles of incorporation, or amended articles of incorporation, the relevant entity is conclusively recognized in Utah as a nonprofit corporation that is "in existence." *See Terry v. Wilkinson Farm Service Co.*, 2007 UT App 369, ¶ 8, 173 P.3d 204.

¶43   Free Wesleyan also argues that, even if filing the Amended Articles did not confirm their validity, issuing new certificates of existence did. We are not persuaded.

¶44   A certificate of existence does not certify the legal validity of the underlying corporate documents. Instead, a certificate of existence allows the applicant to access "facts of record in the [D]ivision." Utah Code Ann. § 16-6a-113(2) (LexisNexis 2013). Certificates list the "corporate name" and state "the corporation is incorporated under the law of this state"; "the date of its incorporation"; whether "all fees, taxes, and penalties owed to this state have been paid"; the corporation's "most recent annual report" has been filed; "the articles of dissolution have not been filed by the [D]ivision"; and "other facts of record in the [D]ivision that may be requested by the applicant." *Id.*

¶45   Free Wesleyan notes that "a certificate issued by the [D]ivision may be relied upon as conclusive evidence of the facts set forth in the certificate." *Id.* § 16-6a-113(3). We agree with that statement, but "the facts set forth in the

_____

4. As used in the Act, the term "articles of incorporation" includes "amended articles of incorporation." Utah Code Ann. § 16-6a-102(3)(a) (LexisNexis 2013).

certificate" do not include a legal determination regarding the validity of the corporation's actions. Here, the new certificates listed the corporation's name and certified that it was authorized to transact business, was duly registered under the laws of Utah, had paid all fees and penalties, and had filed an annual report. The certificates were conclusive evidence of those facts in the sense that they accurately reflected the Division's records regarding the corporation.

¶46    In *Terry*, this court determined that the Division has "initial, conclusive authority to determine corporate status." 2007 UT App 369, ¶ 4 (quotation simplified). That is, it has the authority to determine whether a nonprofit corporation exists and is in good standing—meaning that the corporation has paid the required taxes, fees, and so forth, has filed the required reports, and has not filed articles of dissolution. *Id.* ¶ 3. The Division exercises this authority, in part, by maintaining corporate information and issuing "certificate[s] of existence." Utah Code Ann. § 16-6a-113(1) ("Any person may apply to the [D]ivision for . . . a certificate of existence for a domestic nonprofit corporation . . . ."); *id.* § 16-6a-104 ("The [D]ivision has the power reasonably necessary to perform the duties required of the [D]ivision under this chapter.").

¶47    Thus, to challenge *the existence* of a nonprofit corporation, a party must first exhaust its administrative remedies. Utah Code Ann. § 16-6a-113; *see also id.* § 63G-4-401(1)–(2) (LexisNexis 2016). But in this case, unlike *Terry*, the RMC and Ma'afu do not claim the corporation does not exist. *See Terry*, 2007 UT App 369, ¶ 5 ("Terry argues that because Wilkinson's charter expired . . . , it suffered a dissolution and corporate death . . . and was no longer in existence." (quotation simplified)). They claim instead that the mail-in vote was not authorized by TUMC's governing documents and thus the changes purportedly made to those documents and to the corporation by Free Wesleyan are invalid. Such a determination is outside the Division's authority.

¶48    As the Division clarified on multiple occasions, it made no determination regarding the validity of the Amended Articles or Free Wesleyan's actions. Even after the Division removed the "hold" and reinstated the changes, its records noted that the principals were "still in dispute."

¶49    In sum, we agree with the district court that the Division never made a determination regarding the validity of the mail-in vote, the Amended Articles, or any of the resulting changes. Those issues turn on legal questions that fall outside the Division's authority. And because the Division did not make such a determination, the RMC and Maʻafu were not required to raise their claims there before seeking relief in the district court. Accordingly, the district court had subject matter jurisdiction over the dispute.

## II. Standing

¶50    Free Wesleyan argues that the RMC and Maʻafu lack standing under the traditional test for standing to challenge the validity of the Amended Articles. It further argues that, even if the RMC and Maʻafu have standing under the traditional test, the Act preempts their standing. We address each argument in turn, concluding that the RMC and Maʻafu have standing under the traditional test and that the Act does not preempt their standing.

### A.    Traditional Standing

¶51    "In Utah, standing is a jurisdictional requirement" and "[a] challenge to a party's standing raises fundamental questions regarding a court's basic authority over the dispute." *Osguthorpe v. Wolf Mountain Resorts, LC*, 2010 UT 29, ¶ 14, 232 P.3d 999 (quotation simplified). Generally, standing is satisfied when a party has "a personal stake in the outcome of the dispute." *Victor Plastering, Inc. v. Swanson Bldg. Materials, Inc.*, 2008 UT App 474, ¶ 9, 200 P.3d 657 (quotation simplified).

¶52    "Not surprisingly, the vast majority of Utah standing law has developed in the context of evaluating a plaintiff's ability to prosecute a claim, not a defendant's ability to defend against it." *MCG S. LLC v. Veracity Networks LLC*, 2018 UT App 33, ¶ 15, 415 P.3d 1174 (quotation simplified). But the Utah Supreme Court has established that "[w]here a plaintiff meets the jurisdictional requirements to bring a cause of action, there is no need to evaluate whether a defendant has standing to defend the action." *Osguthorpe*, 2010 UT 29, ¶ 14. "[A] defendant will necessarily have a personal stake in the outcome of litigation solely by virtue of being named as a party defendant." *MCG S.*, 2018 UT App 33, ¶ 15.

¶53    Here, Free Wesleyan filed a complaint against Ma'afu, seeking to exclude him from the church property and prevent him from acting on behalf of the church. It also sought damages for conversion, and attorney fees. In the complaint, Free Wesleyan asserted that, "pursuant to a duly held ballot, [it] has legally amended [the Original Articles]" and removed Ma'afu from the board of directors, stripping him of "any authority to represent the Corporation in any capacity." Free Wesleyan's claims against Ma'afu turn on whether its actions in amending the Original Articles and removing Ma'afu from his position on the board of directors were valid. As a named defendant, Ma'afu has standing to defend himself against Free Wesleyan's lawsuit. *See id.* And because the result of that lawsuit depends on whether Free Wesleyan's corporate actions were done with proper authority, Ma'afu has standing to challenge those actions as part of his defense.

¶54    Further, the district court permitted the RMC to intervene as a defendant in Free Wesleyan's lawsuit against Ma'afu. The Utah Supreme Court has determined that, "[u]pon proper intervention, a party has the ability to file any relevant motions regarding the subject matter of the claims." *Osguthorpe*, 2010 UT 29, ¶ 18. On appeal, Free Wesleyan does not challenge the RMC's intervention, and we see no reason to conclude it was

improper. Free Wesleyan asserted in its complaint that it had legally disaffiliated from the United Methodist denomination and asked the district court for a declaration that it is the only entity authorized to control the local church property, "including granting or denying access to any person desiring to enter and/or occupy [it]." With that declaration, Free Wesleyan seeks to prevent local United Methodist members from accessing the church property.

¶55 The RMC claims a denominational trust interest in the local church property and argues that Free Wesleyan's actions to enjoin its use as a United Methodist church and convert it to a Free Wesleyan church violate that trust. "When declaratory relief is sought all persons shall be made parties who have or claim any interest which would be affected by the declaration." Utah Code Ann. § 78B-6-403(1) (LexisNexis 2018). As the district court noted in its summary judgment ruling, determining the validity of Free Wesleyan's corporate actions "could affect the RMC's rights and interests to the [church property] and the rights of the members of the [local] church that the RMC purports to represent." Thus, as an intervenor-defendant, the RMC has standing to file motions presenting arguments relevant to Free Wesleyan's claims. And as previously discussed, Free Wesleyan's declaratory judgment action turns on whether its corporate actions were valid under the Original Articles. Accordingly, the RMC has standing to argue that Free Wesleyan's corporate actions were invalid. *See id.*

¶56 The RMC also has standing as a plaintiff in the consolidated case. In its lawsuit against Free Wesleyan, the RMC, along with other parties affiliated with the United Methodist Church, claimed that Free Wesleyan and its members "believe that they are able to transfer and take control of all church property contrary to the Discipline." (Emphasis omitted.) In support of that claim, the RMC asserted that Free Wesleyan has "taken possession of real and personal property owned by [TUMC]; sequestered and spent funds of [TUMC]; effected name

changes to ownership records of real and personal property owned by [TUMC]; and otherwise purported to assume use of and control over [TUMC]'s primary place of worship." And "absent a court order, [Free Wesleyan] will not deliver possession of the property at issue to [the RMC] or to . . . the local church members who have retained their affiliation with the [United Methodist Church]."

¶57   In Utah, the RMC is authorized to enforce the United Methodist Church's denominational interests in matters of local church property, governance, and operations. In that capacity, it has standing to enforce its claimed denominational trust and assert that Free Wesleyan improperly claims "ownership and control" of the local church property. *See id.* § 78B-6-401(1) (LexisNexis 2018) ("Each district court has the power to issue declaratory judgments determining rights, status, and other legal relations within its respective jurisdiction."). Indeed, as the district court recognized in its summary judgment ruling, a determination of the validity of Free Wesleyan's corporate actions "would necessarily resolve all of the parties' claims."

¶58   Free Wesleyan's motion to consolidate the RMC's action with its own action further supports our conclusion that the RMC has standing. In that motion, Free Wesleyan asserted that each of the parties claim the right over the "control and access to the same property," and "[c]onsolidation will enable one Court to adjudicate all issues that have been raised as to the Church Property in one action." It also noted that the district court would necessarily decide all of the parties' claims by "determining whether [Free Wesleyan] properly amended its articles of incorporation and changed its name."

¶59   Free Wesleyan, Ma'afu, and the RMC each claim an interest in the local church property. And a determination of Free Wesleyan's corporate actions is essential to each of those claims. Thus, we conclude that the RMC and Ma'afu have

standing to challenge the validity of Free Wesleyan's corporate actions, including the Amended Articles.

B.      Statutory Standing

¶60      Free Wesleyan argues that the Act prohibits the RMC and Ma'afu from challenging the validity of the corporation's actions. It notes that, "in certain instances, statutory provisions may preempt the traditional elements of standing whereby only those specifically granted standing under the statute may assert standing." (Citing *R.P. v. K.S.W.*, 2014 UT App 38, ¶¶ 5, 28, 320 P.3d 1084.) And because the RMC and Ma'afu "are not listed in the Act as appropriate parties to challenge the Amended Articles," Free Wesleyan argues, they "lack standing" to do so.

¶61      First, Free Wesleyan asserts that Utah Code section 16-6a-304 strips the RMC and Ma'afu of standing. That section governs challenges to a nonprofit corporation's "ultra vires" acts. It provides:

>       (1) Except as provided in Subsection (2), the validity of corporate action may not be challenged on the ground that the nonprofit corporation lacks or lacked power to act.
>
>       (2) A nonprofit corporation's power to act may be challenged: (a) in a proceeding against the nonprofit corporation to enjoin the act brought by: (i) a director; or (ii) one or more voting members in a derivative proceeding; (b) in a proceeding by or in the right of the nonprofit corporation, whether directly, derivatively, or through a receiver, trustee, or other legal representative, against an incumbent or former director, officer, employee, or agent of the nonprofit corporation; or (c) in a proceeding by the attorney general under Section 16-6a-1414.

Utah Code Ann. § 16-6a-304(1)–(2) (LexisNexis 2013).

¶62    After reviewing section 16-6a-304, we conclude that, in this case, it does not preempt traditional standing. As the RMC and Ma'afu note in their brief, Free Wesleyan—as the corporation—initiated this case "to determine the 'respective ownership, rights and obligations' of the parties based on the mail-in [vote] initiated by the dissident members." That is, in its lawsuit against Ma'afu—a former director, according to Free Wesleyan—the corporation requested a declaratory judgment determining whether the mail-in vote and the subsequent corporate actions were valid.

¶63    "The primary purpose of [section 16-6a-304] . . . is to eliminate a corporation's ability to avoid its obligations to third parties by raising a defense of ultra vires." *Reedeker v. Salisbury*, 952 P.2d 577, 588 (Utah Ct. App. 1998). It "provides third parties a measure of certainty when contracting with a corporation in good faith without knowledge of the details of its articles of incorporation or of its internal operations." *Johannessen v. Canyon Road Towers Owners Ass'n*, 2002 UT App 332, ¶ 26, 57 P.3d 1119 (quotation simplified); *see also id.* ¶ 26 n.4 (noting different language in section 16-6a-304, enacted in 2001, from that of the previous ultra vires statute, but applying the same rationale to both provisions).

¶64    Here, Free Wesleyan asked the district court to determine the legal status of the corporation in order to resolve uncertainty regarding the parties' ownership and control of the local church property. Section 16-6a-304 does not prohibit such an action. *See Reedeker*, 952 P.2d at 588 (determining that, notwithstanding the statute "limiting ultra vires as a defense, . . . claims alleging corporate ultra vires acts may still be maintained" but "[s]uch actions would most likely be for declaratory or injunctive relief, not damages"). Thus, notwithstanding section 16-6a-304, we conclude that Ma'afu and the RMC—as parties to Free Wesleyan's action—have standing to challenge the validity of

the mail-in vote as well as the subsequent corporate actions, including the Amended Articles.

¶65    Next, Free Wesleyan asserts that the RMC and Maʻafu "make several claims that are claims owned by the Corporation" and argues that, under the Act, such claims must be brought in a derivative proceeding. The Act establishes that "a proceeding may be brought in the right of a nonprofit corporation" by "a voting member" of the corporation or "a director in a nonprofit corporation that does not have voting members." Utah Code Ann. § 16-6a-612(1) (LexisNexis 2013). According to Free Wesleyan, section "16-6a-612 is fatal to the RMC [and Maʻafu's] claims" because they "are not voting members of the Corporation and did not comply with this section of the Act." That is, it argues that the RMC and Maʻafu "are precluded by [section] 16-6a-612 from having standing to raise [their] claims."

¶66    We also reject this argument. Contrary to Free Wesleyan's assertions, the RMC and Maʻafu do not assert derivative claims. The Act establishes that "[a] complainant may not commence a derivative proceeding" unless the corporation itself refuses "to take suitable action." *Id.* § 16-6a-612(3)(a). As the RMC and Maʻafu note in their brief, "a derivative action assumes that the powers that control a corporation chose not to proceed to assert a claim." *See id.* Here, because the corporation initiated the lawsuit, section 16-6a-612 does not apply. We therefore conclude that section 16-6a-612 does not deprive the RMC and Maʻafu of standing to challenge the mail-in vote and the subsequent corporate actions.[5]

---

5. Free Wesleyan also argues that Utah Code sections 16-6a-111 and 16-6a-203 strip the RMC and Maʻafu of standing. Section 16-6a-111 allows a party to appeal the Division's refusal "to file a document delivered to it for filing." Utah Code Ann. § 16-6a-111 (LexisNexis 2013). Section 16-6a-203 establishes that

(continued…)

¶67    In sum, the Act does not preempt traditional standing in this case, and the RMC and Maʿafu—as parties to Free Wesleyan's lawsuit—have standing to challenge the mail-in vote and the subsequent corporate actions.

### III. Summary Judgment

¶68    Free Wesleyan contends on two grounds that the district court erred in granting partial summary judgment to the RMC and Maʿafu. First, it argues the district court erred in determining that the mail-in vote was not authorized under the corporation's governing documents. Second, it argues that the district court's interpretation and application of the Discipline violated the corporation's and the corporation's members' constitutional rights. We discuss each argument in turn.

A.    Validity of the Mail-in Vote

¶69    Free Wesleyan argues the district court erred in determining that the mail-in vote was not authorized under the corporation's governing documents. We disagree. Because the Discipline was incorporated by reference into the Original Articles, and the mail-in vote did not comply with the Discipline, we affirm the district court's determination.

---

(…continued)

"[t]he filing of the articles of incorporation by the [D]ivision is conclusive proof that all conditions precedent to incorporation have been satisfied, except in a proceeding by the state" to "cancel or revoke the incorporation" or "involuntarily dissolve the nonprofit corporation." *Id.* § 16-6a-203(2). But as previously discussed, the Division did not make a decision regarding the validity of the mail-in vote or the subsequent corporate actions. *See supra* Part I. Thus, in this case, these provisions that deal with the Division's filing of documents do not strip the RMC and Maʿafu of standing to challenge the corporation's actions.

¶70 A nonprofit corporation's articles of incorporation, together with the bylaws and the statute under which the corporation was incorporated, "constitute a contract." *Okelberry v. West Daniels Land Ass'n*, 2005 UT App 327, ¶ 14, 120 P.3d 34 (quotation simplified). And the nonprofit corporation "may not act in any way not authorized" by those governing documents. *Id.* (quotation simplified).

¶71 Further, "[p]arties may incorporate by reference into their contract the terms of some other document." *Consolidated Realty Group v. Sizzling Platter, Inc.*, 930 P.2d 268, 273 (Utah Ct. App. 1996) (quotation simplified). To incorporate a document by reference, "the reference must be clear and unequivocal, and must be called to the attention of the other party, the party must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.* (quotation simplified).

¶72 Free Wesleyan asserts that, when the Original Articles were executed, the Discipline's terms were not known or easily available to the corporation's members. Free Wesleyan does not point to any evidence to support that claim. Instead, it points to the absence of proof, claiming "there is no evidence that the terms of the Discipline were ever provided to the members of the Corporation" and "without evidence to the contrary," it argues, "the proper inference is that the terms of the Discipline were not known or easily available." But contrary to Free Wesleyan's assertion, the undisputed evidence before the district court supported its conclusion that the terms of the Discipline were known or easily available to the corporation and its members when the Original Articles were executed.

¶73 To become affiliated with the United Methodist Church, local congregations must agree to adhere to and follow the Discipline. The evidence in this case establishes that the corporation and its members agreed to this requirement when they executed the Original Articles. Indeed, the corporation's

stated purpose "is to conduct and operate a United Methodist Church and congregation according to the Discipline." The Original Articles also state that "[a]ll title to real property bought and sold by the [c]orporation shall be in full conformity with the Discipline," that the internal affairs of the corporation and the corporation's bylaws must "remain in accord with . . . the Discipline," and that "[t]he Board of Trustees shall . . . [be] elected and organized as prescribed in the Discipline." Additionally, the same year the Original Articles were executed, the corporation purchased property, and the grantor required the property to be "used, kept and maintained as a place of divine worship . . . subject to the Discipline."

¶74    Following incorporation, the local congregation functioned according to the Discipline for more than thirty years. Of particular relevance here, it conducted annual Charge Conferences, which were presided over by the district superintendent. This is not surprising, given that the Discipline is the governing document of the United Methodist Church, is published every four years, and is made available to local congregations. Because TUMC was a self-professed affiliate of the United Methodist Church, it is unreasonable to infer that the corporation and its members did not have access to the Discipline when the Original Articles were executed. *See Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 37, 10 P.3d 338 (explaining that, on summary judgment, "[t]he law . . . does not require unreasonable factual inferences, nor does it require that the court turn a blind eye to reasonable inferences based on uncontested facts").

¶75    Free Wesleyan argues that such an inference is reasonable because "the Discipline is a long and complex document," and the corporation's members were "first generation Tongan immigrants . . . with limited ability to worship in English." But the fact that a document is long and complex and that some of the corporation's members were first generation Tongan immigrants does not, without more, suggest that the document

was not either (1) known to those members who professed to follow its terms or (2) easily available to them. "Under Utah law, each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 28, 245 P.3d 184 (quotation simplified). Where, as here, the contract clearly and unequivocally references an incorporated document, "[a] party may not sign [the] contract and thereafter assert ignorance" based on a lack of English proficiency. *Id.* (quotation simplified); *see also Semenov v. Hill*, 1999 UT 58, ¶ 12, 982 P.2d 578 (explaining that "the illiteracy of a party" is relevant to "the existence of fraud in procuring a signature," but "*in the absence of fraud or mistake* he will be bound by all [the contract's] provisions").

¶76    Thus, even accepting as true Free Wesleyan's assertion that the Discipline is a "long and complex document" and that the corporation's members were "first generation Tongan immigrants," no jury could reasonably infer based on those facts alone that the Discipline's terms were not "known or easily available" to the corporation and its members when the Original Articles were executed. *See Sizzling Platter*, 930 P.2d at 273.

¶77    Free Wesleyan argues next that, because the Discipline is not specifically mentioned in the "Amendments" provision of the Original Articles, TUMC did not intend the Discipline to apply to that provision. This argument also is unavailing.

¶78    The "Amendments" provision states, "These Articles . . . may be amended by the vote of at least two-thirds of the members of the corporation present at the annual meeting or at a special meeting of the corporation called for that purpose." Although this provision does not specifically reference the Discipline, it also fails to distinguish a "special meeting" for amendment purposes from the "special meetings" provided for in the Discipline. To properly interpret the parties' intent, we must consider the "Amendments" provision "in relation to all

the others, with a view toward giving effect to all and ignoring none." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (quotation simplified).

¶79 The Original Articles state that the corporation must conduct and operate the local congregation according to the Discipline, and that the corporation's internal affairs must remain in accord with the Discipline. Given these clear, unequivocal references, we conclude that corporation and its members intended the Discipline to apply to the entirety of the Original Articles, including the "Amendments" provision.

¶80 Finally, we reject Free Wesleyan's argument that the Discipline permitted the mail-in vote. Under the Discipline, any meeting—annual, special, or otherwise—must be presided over and called by the district superintendent, and only members present at those meetings are entitled to vote. Here, the mail-in vote did not comply with those requirements.

¶81 We therefore conclude the district court did not err in determining that the Discipline was incorporated by reference into the Original Articles, and because of this, the mail-in vote was unauthorized under the corporation's governing documents.

B.     Constitutional Claims

¶82 Free Wesleyan argues that the "trial court's interpretation and application of the Discipline violated the corporation's and its members' constitutional rights." We disagree. The district court's analysis did not violate Free Wesleyan's constitutional rights because "no question of church doctrine is central to this case." *Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998).

¶83 "The state has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones v. Wolf*, 443 U.S. 595, 602

(1979). But the state and federal constitutions prohibit civil courts "from resolving church property disputes on the basis of religious doctrine and practice." *Id.*; *see also Jeffs*, 970 P.2d at 1251–52.

¶84    Although courts may "open[] their doors to disputes involving church property," they must decide those disputes "without resolving the underlying controversies over religious doctrine." *Jeffs*, 970 P.2d at 1244 (quotation simplified). Essentially, courts "must treat property disputes between religious factions in the same manner they treat disputes among other voluntary associations." *Id.* at 1251 (quotation simplified). But a court's analysis should be "carefully crafted to be the least restrictive means available to further the state's compelling interest . . . in a manner that minimizes the burden upon free exercise." *Id.*

¶85 Considering these principles, the district court's interpretation and application of the Discipline was constitutionally sound. In resolving the dispute, the court looked to the corporation's governing documents, "without inquiring into matters of church doctrine." The Discipline requires any meeting of the Charge Conference or the Church Conference to be presided over and called by the district superintendent. The Discipline does not authorize mail-in voting. Instead, at a Charge Conference, "[t]he members present and voting at any duly announced meeting shall constitute a quorum." And at a Church Conference, the vote extends only to "members of the local church present at [the] meetings."

¶86    Free Wesleyan argues that these matters relate to "faith and doctrine." We disagree. Whether a corporate meeting must be called and presided over by a certain person and whether voting members must be present at a meeting are not matters of religious doctrine or faith. Indeed, the district court would clearly have considered these issues in a "dispute[] among other voluntary associations." *Id.* at 1251.

¶87    Free Wesleyan seems to make a "slippery slope" argument, contending that "there would be no end to the intrusion of government into religious matters" if "the interpretation of the Discipline in the manner pursued by the [district] court" were allowed. Essentially, because "the Discipline is a religious document, setting forth religious goals and religious means to accomplish religious purposes," it asserts that any interpretation of that document "violated [Free Wesleyan's] constitutional rights."

¶88    But, as stated, the law provides standards to help courts avoid such constitutional issues. In Utah, courts must "decide church property disputes without resolving underlying controversies over religious doctrine." *Id.* at 1244. Here, the court interpreted the Discipline according to those standards.

¶89    In sum, the district court's analysis did not violate Free Wesleyan's constitutional rights because "no question of church doctrine is central to this case." *Id*.

CONCLUSION

¶90    The RMC and Ma'afu were not required to exhaust any administrative remedies before seeking relief in the district court. They also have standing to assert their claims against Free Wesleyan. And the district court did not err in granting partial summary judgment to the RMC and Ma'afu on their claim that the mail-in vote was not authorized by the corporation's governing documents. We affirm.

_____